

THOMAS J. CATLIOTA
U.S. BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at Greenbelt

| | | |
|---|---|---|
| In re: | * | Case No.   16-12833-TJC |
| Pierre Richard Augustin | * | Chapter   7 |
| Debtor | * | |
| * * * * * * * * | * | |
| Pierre Richard Augustin | * | |
| Plaintiff | * | |
| vs. | * | Adversary No. 16-00205 |
| U.S. Department of Education | * | |
| Defendant | * | |
| * * * * * * * * * * * * * * | | |

## MEMORANDUM OF DECISION

On April 22, 2016, plaintiff Pierre Richard Augustin filed a complaint seeking discharge of his student loan debt pursuant to 11 U.S.C. §523(a)(8). Now before the court is the motion for summary judgment filed by defendant United States Department of Education (the "DOE"), opposed by Mr. Augustin without the assistance of counsel. ECF 48, 49, 50, 51. For the reasons set forth in this memorandum, the court grants summary judgment to the DOE, concluding that excepting Mr. Augustin's student loan debt from discharge would not impose an undue hardship on him and his dependents as required by §523(a)(8).

1

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§1334(b) and 157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This is a core proceeding under 28 U.S.C. §157(b)(2)(I).

## *Procedural History*

Mr. Augustin filed for chapter 7 relief on March 4, 2016. In his amended Schedule E, he listed Great Lakes Borrower Services as a creditor with a claim of $210,000. ECF 21 at 2 of 8 (Case No. 16-12833). He also marked the claim as disputed and a nonpriority unsecured student loan. *Id.* He received his chapter 7 discharge on June 14, 2016, after the chapter 7 trustee determined there were no assets to administer for the estate. ECF 23 (Case No. 16-12833). This is his second chapter 7 discharge; in 2005, Mr. Augustin filed for chapter 7 in Massachusetts, and he received a discharge on September 26, 2006. Case No. 05-46957 (Bankr. D. Mass.).

Prior to discharge, on April 22, 2016, Mr. Augustin filed this adversary proceeding. In his complaint, he contends that he has been burdened by his student loans for 24 years and that his financial circumstances have not permitted him to pay the loans. ECF 1 at 5 of 28. He argues that he is left with no choice but to seek a determination that his loans are dischargeable under the "undue hardship" exception provided in 11 U.S.C. §523(a)(8). *Id.* At the conclusion of discovery, the DOE filed the subject motion for summary judgment. The court held a hearing on the motion on May 22, 2018. The matter is ripe for resolution.

## *Material Facts Not In Dispute*

Mr. Augustin has never made a payment on his student loans. He is about 50 years old, healthy, married, and employed full-time. ECF 49 at 12. He has worked as a security guard for various companies and government contractors since 2007. His wife is a teacher, is over 50

years old, and has her own personal student loan debt of approximately $120,000. ECF 49 at 5.[1] Until recently, Mr. Augustin was the main source of income for his family, which included his wife and four children. *Id.* at 6. His wife recently obtained a full-time position, but had previously worked on a part-time basis. They share their living expenses and continue to support a daughter who attends college, along with the other children. *Id.* at 5.

Mr. Augustin holds three higher education degrees. He received a bachelor's degree in political science from Salem State, a master's degree in public administration from Suffolk University in Boston, Massachusetts in 1996, and a master's degree in business administration from the University of Massachusetts Lowell in 1999. ECF 48-2, Dep. 25:17-22, 26:17-24, 43:23-44:17; ECF 48-3 at 12 of 16.

Mr. Augustin received 13 direct loans from the DOE. ECF 48-9 at ¶3. In 2001 and in 2013, he consolidated his student loans under the William D. Ford Federal Direct Loan Program. *Id.* at ¶4. The loans were serviced by Great Lakes. *Id.* at ¶5. He received forbearances on his student loans up until June 2015 when he no longer qualified. *Id.* at ¶6. Mr. Augustin states that his loans have "now ballooned to over $200,000 after 28-years of diligently delaying payment through the proper use of forbearances and deferments, or negotiated alternative repayment plans . . . ." *Id.* at 12.

Mr. Augustin has worked in various jobs and industries. He did not work from 1992-1995 because he returned to his home in Haiti. ECF 48-2 at Dep. 26:3-12. However, upon his return to the U.S. in 1997, he began working at the Department of Public Health as a program coordinator in Massachusetts. *Id.* at Dep. 27:4-28:22. There, Mr. Augustin worked 40 hours a week from 1997 to 2002. *Id.* In 2002, Mr. Augustin returned to Haiti to take care of his sick

---

[1] Mr. Augustin has requested that his wife's name should not be made part of the record, and so she will be referred to as "his wife" or "his spouse" in this memorandum.

mother, and while there he started a wholly owned corporation that shipped textiles and fabrics from the United States to Haiti. *Id.* at Dep. 29:11-31:18. The company also provided computer services. *Id.* at Dep. 46:10-14. The business failed and in 2005 he returned to the U.S. *Id.* at Dep. 31:17-22; 32:16-21; 34:5-10. From 2005-2007, Mr. Augustin worked as a substitute teacher for $10 to $11 per hour in Massachusetts. *Id.* at Dep. 35:10-16.

In 2007, Mr. Augustin and his family moved to Fairfax, Virginia, and since then he has worked as a security guard. His wife also worked as a substitute teacher from 2008 to 2016. ECF 48-1 at 4. From 2007-2009, Mr. Augustin worked as a security guard for Triton Security for $10-$15 per hour. ECF 48-2 at Dep. 39:7-40:6. In 2009, he was paid $19 to $20 per hour as a security guard. *Id*. at Dep. 41:25-43:16. Over the years, Mr. Augustin continued to work as a security guard for government contractors. *Id.* During that time, he has received raises and is currently being paid $27.50 per hour. *See* ECF 48-3. He works 35-40 hours per week, and he occasionally works overtime. ECF 48-2 at Dep. 43:6-9. Mr. Augustin is paid bi-weekly and earns $3,903.86 a month, after deductions for taxes, a pension, 401K plan, health insurance, dental and vision insurance, and life insurance. ECF 48-1 at 3 of 26; *see* ECF 48-3. He states that he has not found employment in the field of his degree to earn a higher income. ECF 49 at 12 of 32.

In 2015, Mr. Augustin started a craft beer business. He invested $57,711 to start the business. ECF 48-2 at Dep. 104:16-105:12; ECF 48-6. On his 2015 tax return, he claimed a $33,000 business loss. *Id.* at Dep. 101:6-14 and 102:12-23; ECF 48-6. He also claimed a $12,599 business loss on his 2016 individual tax returns. ECF 48-7. Mr. Augustin continued to invest in the venture, and by 2017, his investment totaled $91,379. ECF 48-8 at 6 of 11. He states that he took out personal loans to fund the venture and did not use any of his income. ECF

4

49 at 6-7. During this period he visited China several times, and also Taiwan, Mexico, Sweden and London in an effort to generate business.

After the termination of his student loan forbearance period, in October 2015, Mr. Augustin applied for an income-contingent repayment plan. The parties dispute whether Mr. Augustin completed the application process.

On August 29, 2016, the DOE emailed him stating that his student loan debt eligible for their repayment plan was approximately $205,002. *Id.* at 3. The email also informed Mr. Augustin that if he applied for the income-contingent repayment plan, based on the information then available, his monthly payments would be $331 a month, and after 25 years of payments, the remainder of his loan indebtedness would be forgiven if his financial situation did not change. *Id.* at 3-4. In the email, the DOE also offered an alternative plan that would terminate upon his retirement age of 65: $1,138.91 per month for 15 years. *Id.* The DOE has informed Mr. Augustin that the monthly payment based on the income-contingent repayment plan could be revisited if his income declined in the future.

Mr. Augustin responded and made a counter-offer by email to the DOE. He asserted that under the income-contingent repayment plan he would face a lifetime of crushing debt, unless the court granted him a full or partial discharge of his student loans. *Id.* at 4-5. He also expressed his desire to retire when he turned 60 years old, and that he wanted to save for retirement versus pay his student loans for 25 years. *Id.* He stated he could not afford the 15-year repayment plan of $1,138.91 per month because it would leave him in abject poverty and it would not allow him to save for retirement. *Id.* Mr. Augustin contended that the income-contingent repayment plan also would leave him with a tax liability in 25 years upon loan

5

forgiveness.  *Id.*  Lastly, he argued that he needed to continue to support his daughter in college.  *Id.*  For these reasons he rejected the income-contingent repayment plan proposal.

## *Discussion*

### *Standards on Summary Judgment*

A motion for summary judgment is governed by Fed. R. Civ. P. 56, made applicable here under Fed. R. Bank. P. 7056.  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" for if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

> In evaluating a summary judgment motion, a court "must consider whether a reasonable [factfinder] could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *Apex*, 190 F.3d at 633. In doing so, a court is not entitled to either weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). If the moving party is unable to demonstrate the absence of any genuine issue of material fact, summary judgment is not proper and must be denied. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 351–352 (4th Cir. 2007).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must come forward with specific facts showing that there is a genuine issue for trial."  *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Those specific facts must be supported by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ."  *Matushita Elec. Industrial Co. v.*

*Zenith Radio Corp.*, 472 U.S. 574, 586-587 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there by no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). A "scintilla of evidence" provided by the nonmovant is insufficient to establish "concrete evidence" that a reasonable factfinder could find in the nonmovant's favor at trial. *Id.* at 252, 256. Whereas the moving party must establish its right to judgment as a matter of law and can establish this by showing that there is an absence of evidence to support the nonmoving party's case. *Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390, 393 (4th Cir. 1994) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 10 (2d ed. Supp. 1994) and *Celotex*, 477 U.S. at 325).

*Exceptions to Discharge of Student Loan Debts*

Section 523(a)(8) provides:

(a) A discharge under section 727 . . . of this title does not discharge an individual from any debt—
(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for –
(A)(i) an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution;

§523(a)(8)(A)(i). Here, there is no dispute that Mr. Augustin's student loans are within the scope of §523(a)(8)(A)(i). Thus, his student loans are not subject to discharge unless they impose an undue hardship on him and his dependents.

The Bankruptcy Code does not define the term "undue hardship," however it is well established in the Fourth Circuit that "undue hardship" means that there "must be more than the usual hardship that accompanies bankruptcy. [An] [i]nability to pay one's debts by itself cannot

7

be sufficient, otherwise all bankruptcy litigants would have undue hardship." *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 399 (4th Cir. 2005). To prove an undue hardship, a debtor must satisfy the three-pronged *Brunner* test, as adopted by the Fourth Circuit. *In re Frushour,* 433 F.3d at 400 (citing *Brunner v. New York State Higher Education Corp.*, 831 F.2d 395 (2d. Cir. 1987) (per curium)). The *Brunner* test is the definitive and exclusive standard that bankruptcy courts—within the Fourth Circuit and most other circuits courts—must utilize to determine whether a debtor is eligible to discharge their student loans.[2] *See e.g. id.*; *United States Dep't of Educ. v. Gerhardt (In re Gerhardt),* 348 F.3d 89, 91 (5th Cir. 2003)*; Hemar Ins. Corp. of Am. v. Cox (In re Cox),* 338 F.3d 1238, 1241 (11th Cir. 2003)*; United Student Aid Funds, Inc. v. Pena (In re Pena),* 155 F.3d 1108, 1114 (9th Cir. 1998)*; Penn. Higher Educ. Assistance Agency v. Faish (In re Faish),* 72 F.3d 298, 306 (3d Cir. 1995)*; Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman),* 25 F.3d 356, 359-60 (6th Cir. 1994)*; In re Roberson,* 999 F.2d 1132, 1135-36 (7th Cir. 1993)*.* The test requires the debtor to establish:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* The *Brunner* test preserves the Congressional purpose in enacting §523(a)(8) by safeguarding the integrity of the student loan program, maintaining its fiscal strength, and

---

[2] Mr. Augustin attached to his opposition a copy of an amici brief in *Murphy v. U.S. Dep't of Ed.*, Case No. 14-1691 (1st Cir. July 29, 2015) and a law review article, Jason Iuliano, "An Empirical Assessment of Student Loan Discharges and the Undue Hardship Standard", 86 AMBKRLJ 495 (Summer 2012). While not explicitly stated by Mr. Augustin in his opposition, it appears that he is urging the court reject the *Brunner* test and adopt the so-called less restrictive totality of the circumstances test, *see In re Long*, 322 F.3d 549, 554 (8th Cir. 2003). ECF 49-1. The court is bound by the precedent of the Fourth Circuit and will apply the *Brunner* test.

preventing debtors from easily passing on student debts onto the taxpayers. *In re Erbschloe*, 502 B.R. 470, 476 (Bankr. W.D. Va. 2013) (citing *Frushour,* 433 F.3d at 399).

A debtor bears the burden, by a preponderance of the evidence, that he or she is "in the *limited class* of debtors for which §523(a)(8) meant to allow discharge." *Educ. Credit Mgmt. v. Mosko (In re Mosko)*, 515 F.3d 319, 324 (4th Cir. 2008) (emphasis in original) (quoting *In re Frushour*, 433 F.3d at 404).

> Each undue hardship discharge must rest on its own facts, but dischargeability of student loans should be based on a 'certainty of hopelessness.'. . . In order to discharge a student loan, a debtor must show that unique or extraordinary circumstances which created the hardship render it unlikely that the debtor will ever be able to honor her obligations.

*In re Murphy*, 305 B.R. 780, 792 (Bankr. E.D. Va. 2004) (citations omitted).

*First Prong: Minimal Standard of Living*

Under the first prong of the *Brunner* test, a court must look at the debtor's current income and expenses and "examine the debtor's standard of living, 'with a view toward ascertaining whether the debtor has attempted to minimize the expenses of himself and his dependents.'" *U.S. Dept. of Health & Human Serv's. v. Smitley,* 347 F.3d 109, 117 (4th Cir. 2003) (quoting *Rice v. United States,* 78 F.3d 1144, 1149 (6th Cir. 1996)); *see also Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 907 (D.S.C. 1995) *aff'd* 85 F.3d 615 (4th Cir. 1996). Expenses would include food, shelter, clothing, and medical treatment. *In re Nightingale,* 529 B.R. 641, 648 (M.D.N.C. 2015) (quoting *Salinas v. United Student Aid Funds, Inc.*, 240 B.R. 305 (Bankr. W.D. Wis. 1999)). Some courts have looked to the federal poverty guidelines as a benchmark. *See, e.g., Elmore v. Massachusetts Higher Educ. Assistance Corp.*, 230 B.R. 22, 28 (Bankr. D. Conn. 1999) (taking judicial notice of the Federal Poverty Level Guidelines that establish a poverty level for a family of five at $18,770 in 1997 and comparing it to the debtor's combined

family income of $45,000). However, courts in this circuit and others have generally determined the minimal standard of living in light of all the relevant circumstances in a case, and not strictly upon the federal poverty standards. *In re Ammirati*, 187 B.R. at 907; *See, e.g., Educational Credit Management Corp. v. Stanley*, 300 B.R. 813, 818 (N.D. Fla. 2003) (to obtain a hardship discharge by reducing a debtor to poverty is too harsh, but the poverty guidelines may be useful). Thus, the debtor does not need to live in poverty in order to repay a student loan. *In re Faish*, 72 F.3d 298; *Perkins v. Penn. Higher Educ. Assistance Agency (In re Perkins)*, 318 B.R. 300, 305 (Bankr. M.D.N.C. 2004). The inquiry rests more on whether the debtor's budget shows a surplus of income after expenses. If so, then courts generally conclude that the debtor has an ability to maintain a minimal standard of living while paying off their student loans. *In re Pettaway*, 2013 WL 781273, *5 (Bankr. E.D. Va. 2013) (quoting *Burton v. Educ. Credit Mgmt. Corp. (In re Burton)* 339 B.R. 856. 871 (Bankr. E.D. Va. 2006)).

Mr. Augustin submitted the following budget of income and expenses:

| Monthly Budget | Plaintiff | Expenses | Wife | Expenses |
|---|---|---|---|---|
| Plaintiff Net Income as calculated by DOE | $3,904 | | | |
| Wife Net Income as calculated by DOE | | | $2,699 | |
| Monthly Expenses | | | | |
| 1780 Rent: Debtor (2/3) and Wife (1/3) | | $1,187 | | $593 |
| Auto Insurance | | $137 | | |
| Rental Insurance | | $51 | | |
| Cable TV and Internet | | $124 | | |
| Heat Electric & Gas | | $117 | | |
| Clothing & Dry Cleaning | | $200 | | |
| Commuting/food | | $300 | | $300 |
| Daughter use of car to attend school | | $200 | | $200 |
| Food & housekeeping supplies | | $500 | | $500 |
| Cell phones | | $340 | | |
| Personal care products | | $100 | | $100 |
| Credit Card | | $500 | | |
| Car Repairs | | $100 | | $100 |
| Wife Tithing in Churches | | | | $270 |
| Wife Pledging in Churches | | | | $100 |
| **Total Monthly Income** | $3,904 | | $2,699 | |

10

| **Total Monthly Expenses** |  | $3,856 |  | $2,163 |
|---|---|---|---|---|
| **Net Income** | $48 |  | $536 |  |

ECF 49 at 7 of 32.

The budget shows that Mr. Augustin's monthly income is $3,904 (after deductions for taxes and withdrawals for 401K, pension, medical, vision and dental plans). *See* ECF 48-4. The debtor's wife's monthly income is $2,699, for a total of $6,603. The budget shows total household monthly expenses before debt service on student loans of $6,019, which Mr. Augustin allocates $3,856 to himself and $2,163 to his wife. As a result of his allocation of expenses, the budget shows Mr. Augustin personally generating a monthly net income of $48, while his wife personally generates monthly net income of $536. The household monthly net income is $584.

It is apparent that if the court were to consider Mr. Augustin's and his wife's income together on a household basis, the debtor could not meet the first prong of the *Brunner* test. It could not be said that excepting the debt from discharge would impose an undue hardship on the debtor in light of the $584 net monthly income (prior to deductions for student loan payments), which comfortably exceeds the $331 proposed monthly payment on the income-contingent repayment plan offered by the DOE for the debtor's loans.

Mr. Augustin argues that the court can only consider the household income based on his allocation of expenses between he and his wife, and not on a total household basis. The DOE contends the court should consider total household income and expenses. This is not a novel issue, and the courts within the Fourth Circuit have determined that family income, even that of non-debtor spouses, should be included in the analysis. *In re Gill*, 326 B.R. 611, 626 (Bankr. E.D. Va. 2005) (citing . *Educ. Credit Mgmt. Corp. v. Buchanan (In re Buchanan)*, 276 B.R. 744, 751 (N.D.W. Va. 2002) (citing *Virginia State Educ. Assistance Auth. v. Dillon*, 189 B.R. 382, 385 (W.D. Va. 1995); *In re Murphy,* 305 B.R. at 794-5; *White v. U.S. Dep't of Educ. (In re*

11

*White)*, 243 B.R. 498, 509 (Bankr. N.D. Ala. 1999)). In fact, the majority of courts have considered the earnings of both the debtor and spouse for evaluating the debtor's lifestyle. *Id.* (citing *In re White*, 243 B.R. at 509, n.9 (collecting over 40 cases); *see also Sweeney v. Educ. Credit Mgmt. Corp. (In re Sweeney)*, 304 B.R. 360, 362–63 (D. Neb.2002) ("Overwhelming authority requires that a court consider the spouse's income. This court finds no published opinion of a court that holds to the contrary.")).

Moreover, Mr. Augustin would fail the first prong of the test even if the court were to allocate expenses between his wife and him, as he requests. As shown in the above budget, Mr. Augustin has allocated household expenses to himself and his wife in varying degrees. He allocates two-thirds of the rent to himself and one third to his wife. He allocates a number of expenses on a 50/50 basis. But he allocates 100% of a number of expenses to himself. Specifically, he allocates to himself 100% of auto insurance ($137); rental insurance ($51); cable TV and internet ($124); heat electricity and gas ($117); clothing and dry cleaning ($200); cell phones ($340), and credit card payments ($500). His rationale for the allocation is that "[b]ased on our cultural tradition, Plaintiff is responsible for paying most of the rent and [his wife] contributes toward other expenditures in the household." ECF 49 at 6. While the court respects Mr. Augustin's cultural tradition, it is simply arbitrary for him to allocate 100% of these expenses to himself.

For purposes of summary judgment, the court will consider the debtor's financial condition after allocating household expenses between the debtor and his wife based on their relative incomes, 59% of expenses to Mr. Augustin and 41% of expenses to his wife, as follows:[3]

---

[3] In doing so the court does not reject the view that the relevant inquiry is based on household income, but only to show that the debtor fails to meet the first prong of the *Brunner* test even if the court were to allocate the expenses.

|  | Plaintiff's Income and Expenses | | Wife's Income and Expenses | | Total |
|---|---|---|---|---|---|
| **Monthly Income** | $3,904 | | $2,699 | | $6,603 |
| **Monthly Expenses** | | 59% | | 41% | 100% |
| Rent | | $1,050 | | $730 | $1,780 |
| Auto Insurance | | $81 | | $56 | $137 |
| Rental Insurance | | $30 | | $21 | $51 |
| Cable TV and Internet | | $73 | | $51 | $124 |
| Heat Electric & Gas | | $69 | | $48 | $117 |
| Clothing & Dry Cleaning | | $118 | | $82 | $200 |
| Commuting/Food | | $354 | | $246 | $600 |
| Daughter's Car Usage | | $236 | | $164 | $400 |
| Food & Housekeeping Supplies | | $590 | | $410 | $1,000 |
| Cell phones | | $201 | | $139 | $340 |
| Personal Care Products | | $118 | | $82 | $200 |
| Credit Card | | $295 | | $205 | $500 |
| Car Repairs | | $118 | | $82 | $200 |
| Wife Tithing in Churches | | $159 | | $111 | $270 |
| Wife Pledging in Churches | | $59 | | $41 | $100 |
| **Total Monthly Expenses** | | $3,551 | | $2,468 | $6,019 |
| **Net Income** | $353 | | $231 | | |

As shown, the allocation of household expenses based on relative incomes establishes that Mr. Augustin earns income sufficient to pay $353 toward his student loans. This amount exceeds the income-contingent repayment amount of $331, as preliminarily approved by the DOE. ECF 48-1 at 6, 21. Thus, the debtor fails the first prong of the *Brunner* test.

The court notes that it reaches this conclusion even before making any expense adjustments to the budget as is so often done by courts within the Fourth Circuit. Many courts, including the Fourth Circuit, have determined that payments for non-essential items such as internet, cable television, and cellular phones are not considered necessary to maintain a minimal standard of living. *See In re Mosko,* 515 F.3d at 325 (expenditures on internet, cell phones, satellite television and gym membership are not generally necessary to maintain a minimum standard of living); *see also Buchanan*, 276 B.R. at 751-52 (foregoing satellite television and internet service does not constitute an undue hardship); *cf. In re Larson*, 426 B.R. 782, 789

(Bankr. N.D. Ill. 2010) (debtor is "entitled to allocate a small amount of monthly income to discretionary or recreational purposes, which allocation, by definition, is not for a necessity."). Voluntary retirement contributions are also considered unnecessary. *See In re Dunlap*, 2016 WL 93805, *2 (Bankr. W.D.N.C. Jan. 6, 2016) (voluntary contributions to retirement plans is an unnecessary expense for undue hardship purposes). However, there is no *per se* rule that these types of expenses are unnecessary to maintaining a minimal standard of living. *In re Nightingale,* 543 B.R. at 545 (citing *In re Frushour*, 433 F.3d at 400 ("It cannot be said that the transmission of information, whether via Internet or cable, is always unnecessary to maintain a minimal standard of living ... [t]he undue hardship test necessarily requires a case-by-case approach to determine whether certain expenses are or are not essential for maintaining a minimal standard of living")).

As the DOE points out, the debtor lists a number of expenses that generally are not considered necessary to maintain a minimal standard of living. The court will address two. The debtor lists a monthly cell phone expense of $340, which includes service for at least one adult child.[4] The debtor also lists a $500 monthly credit card payment even though he has received a discharge of his debts and his budget is comprehensive on all other expenses. Mr. Augustin has submitted no justification for the necessity of these expenses. At least a portion of these amounts should be deleted from the debtor's monthly expense budget, thereby increasing his net monthly income. Because the court concluded above that the debtor has $353 of monthly income available to pay toward his student loans, the court need not be more precise than to say the debtor fails to establish, based on current income and expenses, that he cannot maintain a minimal standard of living for himself and his dependents if forced to repay the loans. Mr. Augustin therefore fails to meet the first prong of the *Brunner* test.

---

[4] The debtor's cell phone expense includes a data plan for four cell phones. ECF 48 at 8; ECF 48-14.

14

*Second Prong: Additional Circumstances*

The second prong is "prospective . . . and looks for exceptional circumstances beyond the debtor's current situation." *Frushour*, 433 F.3d at 401. The Fourth Circuit stated that this prong is demanding and the debtor must show certainty that his financial situation is hopeless:

> [W]hether "additional circumstances" exist to indicate that the debtor's situation is likely to persist for a significant portion of the loan repayment period, "is the heart of the *Brunner* test." This factor "most clearly reflects the congressional imperative that the debtor's hardship must be more than the normal hardship that accompanies any bankruptcy." We have characterized this as "a demanding requirement" necessitating a "certainty of hopelessness" which confirms the debtor will not be able to repay the loans."

*Spence v. Educ. Credit Mgmt. Corp. (In re Spence),* 541 F.3d 538, 544 (4th Cir. 2008) (quoting *Frushour*, 433 F.3d at 401 (internal marks omitted)).

The court concluded above that Mr. Augustin can maintain a minimal standard of living and still make the required payment offered by the DOE under the income-contingent repayment plan. Thus, he has not shown a "certainty of hopelessness." *Id*. Moreover, Mr. Augustin is not ill, disabled, and he does not have a large number of dependents. *See Frushour,* 433 F.3d at 401 (stating that certain rare circumstances such as illness, disability, lack of usable job skills or large number of dependents might satisfy the second *Brunner* prong). He has usable job skills and he has been receiving small increases in his wages over the years as a security guard. There is nothing to suggest that he will not continue to receive increases. ECF 48-1 at 3. His wife is in general good health. Recently, she gained full-time employment, too. Thus, the record reflects that they should be able to maintain viable employment at their current or higher wage, even while they age toward retirement.

*Third Prong: Good Faith*

The third prong, good faith, requires the court to determine whether the debtor has made payments on his student loans and whether the debtor has made "efforts to obtain employment, maximize income, and minimize expenses." *In re Mosko,* 515 F.3d at 324 (quoting *O'Hearn v. Educ. Credit Mgmt. Corp.*, 339 F.3d 559, 564 (7th Cir. 2003)). Another part of the good faith inquiry is whether the debtor's default in his student loans was caused by factors beyond the debtor's control. *Id.* Finally, the debtor must provide evidence of his efforts to take advantage of repayment and restructuring plans. *Id.*; *see also, e.g., In re Mosley*, 494 F.3d at 1327; *In re Frushour,* 433 F.3d at 402.

Seeking out loan consolidations options is "'an important component of the good-faith inquiry' because such efforts demonstrate that the debtors take their debts seriously and are doing their utmost to repay them despite their unfortunate circumstances." *In re Mosko,* 515 F.3d 319, 326 (4th Cir. 2008) (quoting *In re Frushour*, 433 F.3d at 402). Here, the record is clear as to Mr. Augustin's minimal efforts to make student loan payments. Up until 2015, Mr. Augustin obtained timely deferrals for his student loans. By his own admission, Mr. Augustin deferred his loans for approximately 26 years. ECF 49 at 1. Mr. Augustin did not provide any evidence that he was unable to make some sort of payment, at least on the interest, during those years. Continual deferments without making a payment or seeking out other payment options does not show good faith. *In re Mosko*, 515 F.3d at 327 ("without reasonable efforts to make subsequent payments, requesting deferments and forbearances alone does not establish good faith"). He also did not provide any evidence to show that he sought loan repayment options, other than continuing with forbearance. Because he has not made any payments, his total debt is approximately $210,000.

Regardless of his previous reasons for not making payments on his student loans, Mr. Augustin's current refusal to accept the DOE's offer to pay $331 for 25 years is because he wants to retire by age 65 and wants a fresh start at saving for retirement. This court, like the Fourth Circuit did in a similar case, finds that argument unavailing. In *Frushour*, the debtor there refused to participate in a repayment plan because "it was not suited for her and she wanted a fresh start." The court rejected that argument:

> It is hard to see why these reasons are not simply shorthand for her lack of interest in repaying the debt. The consolidation plan would allow her both to remain at her preferred job and to maintain her current level of expenditures. Accounting for these considerations, Frushour has provided insufficient justifications for refusing to take a simple step that would have allowed her to fulfill her commitments in a manageable way.

*Frushour,* 433 F.3d at 403. The record shows that Mr. Augustin is not willing to accept a manageable repayment plan that would permit him to manage the repayment of his student loans. This shows a lack of good faith on his part.

Therefore, the court concludes that Mr. Augustin did not make good faith efforts to repay his student loans, and failed to satisfy the third prong of the *Brunner* test.

## *Conclusion*

For the reasons set forth above, the court concludes that Mr. Augustin's student loan is not subject to discharge under §523(a)(8). The court will enter an order granting the DOE's motion for summary judgment.

cc:   Debtor
      Debtor's Counsel
      Plaintiff
      Defendant
      Defendant's Counsel
      Chapter 7 Trustee
      U.S. Trustee

**END OF MEMORANDUM OF DECISION**

**END OF MEMORANDUM OF DECISION**